# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **AMERICAN CHEMISTRY COUNCIL**<br>**700 Second Street, NE**<br>**Washington, DC  20002** | ) ) ) ) ) ) | |
| **and** | ) ) | |
| **THE CHLORINE INSTITUTE**<br>**1300 Wilson Boulevard, #525**<br>**Arlington, Virginia  22209** | ) ) ) ) ) | |
| **and** | ) ) | |
| **THE FERTILIZER INSTITUTE**<br>**425 Third Street, SW, Suite 950**<br>**Washington, DC  20024** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Case No. _____** |
| **v.** | ) ) ) | |
| **BNSF RAILWAY COMPANY**<br>    **Serve: Registered Agent**<br>    **CT Corporation System**<br>    **1999 Bryan Street, Suite 900**<br>    **Dallas, Texas  75201-3136** | ) ) ) ) ) ) | |
| **and** | ) ) | |
| **CSX TRANSPORTATION, INC.**<br>    **Serve: Registered Agent**<br>    **Corporate Creations Network, Inc.**<br>    **11380 Prosperity Farms Road, #221E**<br>    **Palm Beach Gardens, Florida 33410** | ) ) ) ) ) ) | |
| **and** | ) | |

**GRAND TRUNK CORPORATION**                )
**d/b/a CANADIAN RAILROAD COMPANY**        )
    **Serve: Registered Agent**                )
    **Corporation Service Company**             )
    **2711 Centerville Road**                   )
    **Wilmington, Delaware 19808**              )
                                               )
**and**                                        )
                                               )
**KANSAS CITY SOUTHERN RAILWAY**           )
**COMPANY**                                    )
    **Serve: William A. Mullins**              )
    **Baker and Miller PLLC**                  )
    **2401 Pennsylvania Avenue, N.W.**         )
    **Washington, DC 20037**                   )
                                               )
**and**                                        )
                                               )
**NORFOLK SOUTHERN RAILWAY**               )
**COMPANY**                                    )
    **Serve:  Registered Agent**               )
    **Roger A. Petersen**                      )
    **Three Commercial Place**                 )
    **Norfolk, Virginia 23510**                )
                                               )
**and**                                        )
                                               )
**SOO LINE CORPORATION**                   )
**d/b/a CANADIAN PACIFIC RAILWAY**         )
**COMPANY**                                    )
    **Serve:  Registered Agent**               )
    **Suite 1000**                             )
    **120 S. 6th Street**                      )
    **Minneapolis, Minnesota 55402**           )
                                               )
**and**                                        )
                                               )

**UNION PACIFIC RAILROAD COMPANY** )
    **Serve: Registered Agent** )
    **CT Corporation System** )
    **5601 South 59th Street** )
    **Lincoln, Nebraska 68516** )
     )
    **Defendants.** )
     )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, American Chemistry Council ("ACC"), The Chlorine Institute ("CI"), and The Fertilizer Institute ("TFI"), for their complaint against Defendants, BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Grand Trunk Corporation d/b/a Canadian National Railroad Company ("CN"), Kansas City Southern Railway Company ("KCS"), Norfolk Southern Railway Company ("NS"), Soo Line Corporation d/b/a Canadian Pacific Railway Company ("CP"), and Union Pacific Railroad Company ("UP") allege and aver as follows:

## NATURE OF ACTION

1.    This is a civil action seeking a Declaratory Judgment and Permanent Injunctive Relief declaring that the Defendants cannot lawfully refuse to transport toxic-inhalation hazard ("TIH") materials because they have failed to equip main lines used to transport TIH materials with an operable Positive Train Control ("PTC") system as required by the Rail Safety Improvement Act of 2008 ("RSIA"), 49 U.S.C. § 20157, and enjoining the Defendants from such refusals.

2.    Pursuant to the RSIA, Congress has required the Defendants to implement PTC on main lines over which TIH materials are transported by December 31, 2015.  Each of the Defendants has acknowledged that it will not meet that deadline, and this has been confirmed by the latest PTC implementation status report submitted to Congress by the Federal Railroad

Administration ("FRA") on August 7, 2015.  Several of the Defendants have expressly declared that they will, or are likely to, refuse to accept TIH materials for transportation as soon as Thanksgiving because they have not complied with the RSIA, unless Congress extends the statutory deadline before then.  In responses to a request by the Plaintiffs, each Defendant has failed to provide reasonable assurances that they will continue to accept TIH materials for transportation after December 31, 2015 if there is no operable PTC system installed on the main lines necessary to provide the requested transportation service.

3.     The Defendants' admitted and/or reasonably anticipated refusal to accept TIH materials for transportation because they have failed to satisfy their obligations under the RSIA does or will unlawfully violate their common carrier obligation, to provide transportation "on reasonable request." at 49 U.S.C. § 11101(a) ("common carrier obligation").  Plaintiffs request that the Court issue a declaratory judgment, and preliminary and permanent injunctive relief enjoining the Defendants from refusing to transport TIH materials because of their non-compliance with the RSIA.

## PARTIES

4.     Plaintiff, American Chemistry Council, is a New York not-for-profit corporation with its headquarters at 700 Second Street, N.E., Washington, DC 20002.  ACC is an industry association that represents America's leading chemical producers.  ACC's 130 members account for approximately 85% of the United States ("U.S.") capacity for the producing basic chemicals and manufacturing a wide array of products, including TIH materials such as chlorine, ethylene oxide, and hydrogen fluoride.  Defendants offer these products, including those designated as TIH, for shipment in the U.S. and Canada.

5.      Plaintiff, The Chlorine Institute, is a Connecticut not-for-profit corporation with its headquarters at 1300 Wilson Blvd, #525, Arlington, VA 22209.  CI is a 200-member trade association of chlor-alkali producers, packagers, distributors, users and suppliers.  It promotes the safety and protection of human health and the environment in the manufacture, distribution and use of chlorine, sodium hydroxide, potassium hydroxide and sodium hypochlorite, plus the distribution and use of hydrogen chloride.  Chlorine accounts for the second largest volume of TIH shipments by rail in the U.S. and Canada.  CI's North American producer members account for more than 95% of the total chlorine production in the U.S., Canada and Mexico.

6.      Plaintiff, The Fertilizer Institute, is a Delaware not-for-profit corporation with its headquarters at 425 Third Street, S.W., Suite 950, Washington, DC 20024.  TFI is the national trade association of the fertilizer industry.  TFI members rely heavily on rail transportation to safely and efficiently move anhydrous ammonia, which is the basic building block required to produce all nitrogen fertilizers.  Anhydrous ammonia accounts for more than 45% of the TIH materials transported by rail each year in the U.S. and Canada, which is the largest volume of any TIH material.

7.      Defendant, BNSF Railway Company ("BNSF") is a Delaware corporation with its principal place of business at 2650 Lou Menk Drive, Fort Worth, TX 76131.  BNSF is a Class I freight railroad and operates the second largest railroad network in North America, primarily in the western U.S. as well as rail lines that extend into several southeastern states and the Canadian province of British Columbia.  BNSF maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, DC 20001.  BNSF routinely conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

8.      Defendant, CSX Transportation, Inc. ("CSX"), is a Virginia corporation with its principal place of business at 500 Water St., Jacksonville, FL 32202.  CSX is a Class I freight railroad operating primarily in the eastern U.S. and Canada.  CSX operates rail lines throughout the eastern U.S. including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, DC 20004.  CSX routinely conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

9.      Defendant, Grand Trunk Corporation ("GTC"), is Delaware Corporation that includes most of the U.S. operations of the Canadian National Railway Company ("CN"), including the Grand Trunk Western, Illinois Central, Wisconsin Central, and smaller railroads. GTC is a wholly owned subsidiary of North American Railways, Inc., a Delaware corporation, which is a wholly owned subsidiary of CN.  GTC is a Class I freight railroad operating primarily between the U.S. Gulf Coast and Chicago and across the Upper Midwest into Canada.  CN maintains its principle place of business in Montreal, Quebec, Canada and has its headquarters for all of its American subsidiaries, including GTC, at 17641 S. Ashland Ave., Homewood, IL 60430.  GTC maintains a government affairs office at 601 Pennsylvania Ave. N.W., Suite 500, North Building Washington, DC 20004.  GTC routinely conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

10.      Defendant, Kansas City Southern Railway Company ("KCS"), is a Missouri corporation with its principal place of business at 427 West 12th Street, Kansas City, Missouri 64105.  KCS is wholly owned subsidiary of Kansas City Southern.  KCS is a Class I freight railroad operating rail lines serving the central and south central United States.  KCS routinely

conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

11.     Defendant, Norfolk Southern Railway Company ("NS"), is a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, VA 23510.  NS is a Class I freight railroad operating primarily in the eastern United States.  NS maintains a government relations office at One Constitution Ave. N.E., Suite 300 Washington DC 20002. NS routinely conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

12.     Defendant, Soo Line Corporation ("Soo"), is a Minnesota corporation that includes all of the U.S. operations of Canadian Pacific Railway Company ("CP"), including Soo Line Railroad; Delaware and Hudson; Dakota, Minnesota & Eastern, and smaller railroads.  Soo maintains its headquarters at 120 South 6th Street, Minneapolis, MN 55402.  Soo is a Class I freight railroad operating more than 14,400 miles of rail in the United States.  CP is owned by Canadian Pacific Railway Limited and both are incorporated federally under the Canada Business Corporation Act and maintain their principle place of business in Calgary, Alberta, Canada.  Soo routinely conducts business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

13.     Defendant, Union Pacific Railroad Company ("UP"), is a Delaware corporation with its principal place of business at 1400 Douglas Street, Omaha, NE 68179.  UP is the largest Class I freight railroad in the U.S. operating primarily in the western U.S.  UP maintains an office at 600 13th Street, N.W., Suite 340, Washington, DC 20005.  UP routinely conducts

business in this District before Congress and regulatory agencies with jurisdiction over its rail operations.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this Complaint pursuant to 28 U.S.C § 1331, as this action raises substantial federal questions relating to the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10101 *et seq*, and the RSIA..

15.     This Court also has subject-matter jurisdiction over this Complaint pursuant to 49 U.S.C. § 11704 to enforce liability against a rail carrier providing transportation subject to the jurisdiction of the Surface Transportation Board ("STB").

16.     This Court is authorized to issue Declaratory Judgments under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Federal Rule of Civil Procedure 57, and to issue Preliminary Injunctive Relief under Federal Rule of Civil Procedure 65.

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because the Defendants resided, transacted business, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND AND RELEVANT FACTS

### The Importance of TIH Materials

18.     For purposes of this Complaint, "TIH materials" are those hazardous materials identified as either "poisonous gas" or "poisonous materials" at 49 C.F.R. §§ 171.8, 173.115(c), and 173.132.   TIH materials sometimes are referred to as "poisonous inhalation hazards" or "PIH," and all references to TIH are synonymous with PIH.   Chlorine and anhydrous ammonia

comprise the vast majority of the TIH materials transported by rail. Other TIH materials transported by rail include ethylene oxide, hydrogen fluoride, and methyl mercaptan, among others.

19.     American farmers rely on anhydrous ammonia, which accounts for the largest volume of TIH materials transported by rail to grow food for millions of Americans. It is the least costly and most effective source of nitrogen fertilizer for American farmers. In addition to its direct application as a fertilizer, anhydrous ammonia is the primary ingredient in all other nitrogen fertilizers such as urea and urea ammonium nitrate solution, and is used to produce phosphate fertilizers such as diammonium phosphate and monoammonium phosphate. Fertilizers high in nitrogen increase crop yields by 40-60% and are essential for crops such as corn, which is the largest consumer of direct applied anhydrous ammonia. A single rail car of ammonia produces approximately 128,000 bushels of corn, which can feed approximately 1,600 cattle or produce 345,600 gallons of ethanol. Corn also is used in thousands of basic food products found on grocers' shelves.

20.     Anhydrous ammonia is also vital to a variety of industrial applications and the only raw material available to produce some consumer goods. For example, anhydrous ammonia is necessary to produce certain pharmaceuticals, adhesives, feed supplements, personal care products and nylon fibers. Coal-burning power plants also use anhydrous ammonia to comply with Clean Air Act emission standards. Rail moves approximately 45% of anhydrous ammonia (2.3-2.4 million tons) produced for industrial applications annually. For most industrial users, there is no substitute for anhydrous ammonia.

21.     Chlorine accounts for the second largest volume of TIH materials transported by rail and is the ninth largest chemical produced (by volume) in the U.S..  Chlorine plays an important role in public health.  Virtually every public drinking water treatment facility in the nation uses chlorine-based disinfectants to remove a wide variety of disease-causing germs from drinking water and wastewater as well as from hospital and food-production surfaces.  Chlorine also is essential to manufacturing thousands of products people depend upon every day from computer chips to crop-protection chemicals to cancer-fighting drugs.  Chlorine also plays a vital role in manufacturing automobiles, telephones, fuel cells, pharmaceuticals, rocket propellants, surgical sutures, paint removers, photographic supplies, plastic materials, and literally thousands of other products.  Some of these products contain chlorine and others depend on chlorine chemistry for an intermediate step in their manufacture.

**Rail is Essential to Transport TIH Materials**

22.     Rail transportation is the primary mode for transporting TIH materials over land. Pipelines and barges may provide alternative transportation options for some TIH materials, but only in the limited geographic areas within the reach of pipelines and navigable waterways and then only to the extent those modes have sufficient capacity.  According to the U.S. Department of Transportation, "TIH materials are essential to the economy and national health;" "[i]t is generally accepted that the safest, most cost effective, and efficient way for moving TIH materials is by rail" and "[t]ransferring large amounts of TIH materials to barges or pipeline are not viable options" due to capacity and equipment constraints.  "Comments of the United States Department of Transportation," STB Finance Docket No. 35504, *Union Pac. R.R. Co.--Pet. for Declaratory Order*, pp. 2 & 5 (filed March 12, 2012).

23.     While trucks can transport anhydrous ammonia, 3-4 trucks are needed to transport the same volume contained in a single rail car, and there is insufficient truck capacity to absorb the substantial volumes that normally move by rail.  Rail transportation is absolutely necessary for anhydrous ammonia to reach those who require it and for suppliers to continue producing anhydrous ammonia in the normal course of their business

24.     More than 5,000 specially designed and approved rail tank cars move chlorine by rail within the U.S.  Only approximately 100 tank trucks are even capable of moving bulk chlorine shipments.  As with anhydrous ammonia, 3-4 tank trucks are required to move the 90 tons of chlorine contained in a single rail tank car.  Rail transportation is absolutely necessary for chlorine to reach those who require it and for suppliers to continue producing chlorine in the normal course of their business.

## The Common Carrier Obligation

25.     Defendants are rail carriers subject to the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101 *et seq.* ("ICCTA").  As such, Defendants must provide transportation of TIH materials "on reasonable request."  49 U.S.C. § 11101(a) ("common carrier obligation").  The Defendants' common carrier obligation reflects over a century of statutory law applicable to rail common carriers.

26.     Over the past decade, Defendants publicly have expressed a desire to be relieved of their common carrier obligation to transport TIH materials and have stated that they would not transport TIH materials but for their common carrier obligation.  On several occasions, Defendants have asked the STB either to relieve them of their common carrier obligation to transport TIH materials or to narrow the scope of that obligation.  The STB has rejected

Defendants' requests and required them to transport TIH materials in accordance with their common carrier obligation.

### The Rail Safety Improvement Act of 2008

27.     The RSIA mandates that PTC be implemented across a significant portion of the U.S. rail industry by December 31, 2015.  The RSIA requires PTC on Class I railroad main lines (i.e., lines over which 5 million or more gross tons are transported annually) that handle any TIH materials as well as any railroad main lines over which regularly scheduled intercity passenger or commuter rail services are provided.  PTC is expected to be implemented over a total of approximately 70,000 miles of track.

28.     PTC refers to communication-based/processor-based train-control technology providing a system capable of reliably and functionally preventing train-to-train collisions, overspeed derailments, incursions into established work zone limits, and train movements through a main line switch in the improper position.

29.     The RSIA required each Class I railroad (*i.e.*, the Defendants) to (a) develop and submit to the Secretary of Transportation a PTC Implementation Plan ("PTCIP") for equipping the requisite main lines with a PTC system by December 31, 2015, within 18 months of the RSIA's enactment, and (b) implement a PTC system in accordance with that plan.  The RSIA's enforcement provisions (49 U.S.C. § 20157(e)), authorize the Secretary to assess civil penalties against any Class I railroad for failing to comply with its approved PTCIP.

### The Status of PTC Deployment

30.     As required by the RSIA, each Defendant submitted a PTCIP to the FRA, which approved those submissions.  Each PTCIP submitted by a Class I railroad identifies the rail lines that the railroad must equip with PTC by December 31, 2015.

31.     The Defendants will not finish implementing PTC on their main lines in accordance with their PTCIPs by the December 31, 2015 deadline.

32.     In March 2014, the Association of American Railroads ("AAR") issued a report titled, "PTC Implementation: The Railroad Industry Cannot Install PTC on the Entire Nationwide Network by the 2015 Deadline" projecting that "by December 31, 2015, PTC will be operable on 20 percent of the route mileage required to be equipped with PTC."

33.     In an August 2015 report to Congress titled "Status of Positive Train Control Implementation," the FRA advised Congress that "most railroads have not made sufficient progress to meet the December 2015 implementation deadline."   This includes all seven Defendants.

34.     According to a September 2015 General Accounting Office report to Congress titled "Positive Train Control:  Additional Oversight Needed as Most Railroads Do Not Expect to Meet 2015 Implementation Deadline,", PTC implementation is not currently estimated to be completed on (a) BNSF's lines until December 2017, (b) UP's lines until December 2018, and (c) CSX's and NS's lines until December 2020.   U.S. Government Accountability Office. "Positive Train Control:  Additional Oversight Needed as Most Railroads Do Not Expect to Meet 2015 Implementation Deadline," p. 41 (September 2015) (Publication No. GAO-15-739).

35.     The Defendants' looming failure to implement PTC in accordance with their PTCIPs by December 31, 2015 has sparked grave concerns among producers and consumers of TIH materials as to whether the Defendants will continue to transport TIH materials after December 31, 2015 when the route involves transporting them over a main line that Defendants have not equipped with PTC.

36.     The Plaintiffs jointly wrote to each Defendant on August 18, 2015 requesting that they clarify their plans for transporting TIH materials as the year-end deadline approaches and ultimately passes without compliance with the RSIA.

37.     About the same time, Senator John Thune, Chairman of the Senate Committee on Commerce, Science, and Transportation, also wrote to the Defendants regarding the effects of Congress not extending their deadline to implement PTC.

38.     While several Defendants responded directly to Plaintiffs' letters, others simply provided copies of their response to Senator Thune.  None of Defendants assured the Plaintiffs that they would continue accepting TIH materials for transportation after December 31, 2015.

39.     UP responded that "without a timely extension [of the PTC deadline], Union Pacific must embargo TIH shipments," that UP anticipates "issuing the embargo notice before Thanksgiving," and "[a]fter the embargo notice is issued, Union Pacific will accept no more TIH loads or residue empties from shippers or consignees at points it serves."

40.     BNSF responded by questioning whether it "legally may operate any freight or passenger service on [mandated lines where PTC has not been installed and operational as of January 1, 2016]," and raised the spectre that it may cease accepting any traffic at all over its main lines required to have operable PTC systems.

14

41.     NS responded by stating that it "is considering ceasing to ship TIH commodities and declining to host passenger trains on its network effective January 1, 2016."

42.     CSX responded by stating that "[w]ithout certainty of a PTC extension in the very near future, CSX will need to begin preparatory actions no later than November 1 to suspend TIH traffic on December 1 in an orderly manner and have all TIH cars off the CSX system by December 31."

43.     CP responded generically by stating that it "intends to comply with regulations and its common carrier obligation" but without explaining whether it will continue transporting TIH materials.

44.     KCS responded by stating that "it is not possible to know precisely what effect the unworkable current PTC obligation will have on [TIH] movements come January 1, 2016," but did not indicate how it will respond to the existing PTC deadline.

45.     CN has not responded to Plaintiffs' letter and did not provide a letter to Senator Thune.

46.     Although the Senate has passed legislation to postpone the December 31, 2015 deadline to implement PTC, there is no bill currently pending in the House of Representatives, nor is there a clear indication whether or when the House might take up such legislation or the President would sign such legislation.

47.     Absent imminent Congressional action or assurances from the Defendants that they will continue transporting TIH materials pursuant to their common carrier obligation when the route involves transportation over a main line that Defendants have not equipped with an

operable PTC system, the Plaintiffs have no choice but to file this Complaint for declaratory and injunctive relief.

## COUNT I
### (Declaratory Relief – Violation of the Common Carrier Obligation, 49 U.S.C. § 11101(a))

48.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 47 as if set forth fully herein.

49.     The RSIA does not repeal or supersede the Defendants' common carrier obligation.   The Secretary of Transportation, acting through the FRA to adopt rules implementing the RSIA, has stated that he "does not view the requirement to install PTC systems on certain rail lines as affecting the common carrier obligation.   "Positive Train Control Systems," 77 Fed. Reg. 28285, 28292-93 (May 14, 2012).

50.     The RSIA does not prohibit the Defendants from transporting TIH materials over main lines without operable PTC systems after December 31, 2015.

51.     The RSIA imposes an affirmative mandate upon each Defendant to implement PTC in accordance with its PTCIP by December 31, 2015.

52.     Defendants may not refuse to transport TIH materials pursuant to their common carrier obligation because they have failed to comply with the RSIA, or because of the resulting consequences to them of their non-compliance.

53.     Defendants' refusal to accept TIH materials for transportation because they have not complied, or will not comply, with their statutory duty to implement PTC on their main lines under the RSIA by December 31, 2015, unlawfully violates their common carrier obligation to transport TIH materials on reasonable request.

## COUNT II
### (Preliminary Injunction)

54.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 53 as if set forth fully herein.

55.     Plaintiffs and their member companies will suffer immediate and irreparable harm as a direct and proximate result of Defendants' refusal to accept, or to state whether they will accept, TIH materials for transportation on main lines that Defendants have not equipped with PTC in accordance with their PTCIPs and the RSIA,

56.     As producers and consumers of TIH materials, Plaintiffs' member companies must begin (a) identifying and obtaining alternative transportation to the extent available, (b) curtailing and potentially ceasing operations at their plants that produce or consume TIH materials, and (c) retrieving and storing their rail cars to avoid stranding them across the national rail network on January 1, 2015.

57.     Plaintiffs cannot wait until New Year's Eve to make these decisions because they require weeks to implement and Defendants have threatened to embargo TIH materials as soon as Thanksgiving.

58.     Plaintiffs cannot possibly fully quantify the time, effort and cost of planning for, and implementing, this contingency that the Defendants could avoid by continuing to transport TIH materials on main lines not equipped with PTC.

59.     Plaintiffs and their member companies will suffer irreparable injury due to their inability to produce or consume TIH materials as a direct and proximate result of a refusal by Defendants to accept TIH materials for transportation on main lines that they have not equipped with PTC in accordance with their PTCIPs and the RSIA.

60.     The public interest will also suffer immediate and irreparable harm due to the Plaintiff's inability to transport TIH materials by rail as a direct and proximate result of a the Defendants' refusal to accept TIH materials for transportation on main lines that Defendants have not equipped with PTC in accordance with their PTCIPs and the RSIA.

61.     TIH materials are essential to U.S. public health and safety, food production, industrial production, and most products that we use in our daily lives.

62.     Most rail shipments of TIH materials cannot reach their destination by alternative transportation modes either because no alternative exists or there is insufficient capacity to absorb all, or even most, of the rail volumes.

63.     For those TIH materials that can move by truck, the public interest strongly favors rail transportation as a safer mode of transporting TIH materials.

64.     The irreparable injury to the Plaintiffs and to the public at large can only be remedied by injunctive relief.

65.     Plaintiffs have a substantial likelihood of success on the merits of this action.

66.     The balance of the equities strongly favor the Plaintiffs which, as producers and consumers of TIH materials, are not responsible for the Defendants' failure to comply with the RSIA, but will nevertheless suffer the most severe consequences if Defendants' failure permits them to avoid their common carrier obligation to transport TIH materials.

67.     The injunctive relief sought by Plaintiffs would not alter the status quo.

68.     Rail transportation of TIH materials after December 31, 2015 will occur in the same manner and over the same routes as they do currently.

69.     Granting injunctive relief would simply put the parties in the same position in which they have operated for many years and would allow affected producers and consumers of critical TIH materials to continue protecting themselves and their communities.

70.     Pursuant to Federal Rule of Civil Procedure 65, this Court should issue a Preliminary Injunction enjoining Defendants during the time between the pendency of this action and the entry of final judgment from refusing to transport TIH materials because they have failed to equip the main lines used to transport TIH materials with an operable PTC system as required by the RSIA.

## COUNT III
### (Permanent Injunction)

71.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 70 as if set forth fully herein.

72.     Regardless of whether this Court grants Plaintiffs a Preliminary Injunction as requested in Count II herein, this Court should issue, as part of any final judgment in this action, a permanent injunction enjoining Defendants from refusing to transport TIH materials because they have failed to equip the main lines used to transport TIH materials with an operable PTC system as required by the RSIA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs hereby request that this Court grant the following relief:

(1)     Enter judgment declaring that Defendants' refusal to transport TIH materials because they have failed to equip the main lines used to transport TIH materials with an operable PTC system as required by the RSIA violates their common carrier obligation;

19

(2)      Issue a Preliminary Injunction enjoining Defendants from refusing to transport TIH materials because they have failed to equip the main lines used to transport TIH materials with an operable PTC system as required by the RSIA;

(3)      Issue a Permanent Injunction enjoining Defendants from refusing to transport TIH materials because they have failed to equip the main lines used to transport TIH materials with an operable PTC system as required by the RSIA; and

(4)      Grant Plaintiffs such other and further relief, including costs, as the Court may deem just and proper.

Respectfully submitted,

By: _____ /s/ Jeffrey O. Moreno _____
Jeffrey O. Moreno (440070)
John T. Bergin (448975)
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
Phone: (202) 331-8800
Fax: (202) 331-8330
jeff.moreno@thompsonhine.com
john.bergin@thompsonhine.com

Paul M. Donovan (105189)
LaRoe, Winn, Moerman & Donovan
1250 Connecticut Avenue, N.W. Suite 200
Washington, DC 20036
Phone (202) 298-8100
Fax (202) 298-8200
paul.donovan@laroelaw.com

*Counsel for Plaintiffs*

Dated: September 29, 2015